**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Shirley K. Klahn, | CIV 10-8201-PCT-MHB |
| Plaintiff, | **ORDER** |
| vs. | |
| Michael J. Astrue, Commissioner of the Social Security Administration, | |
| Defendant. | |

Pending before the Court is Plaintiff Shirley K. Klahn's appeal from the Social Security Administration's final decision to deny her claim for disability insurance benefits and supplemental security income benefits. After reviewing the administrative record and the arguments of the parties, the Court now issues the following ruling.

**I. PROCEDURAL HISTORY**

On January 18, 2008, Plaintiff filed an application for disability insurance benefits and supplemental security income benefits pursuant to Titles II and XVI of the Social Security Act alleging disability since December 29, 2007, due to tarsal tunnel syndrome in her feet following a motor vehicle accident. (Transcript of Administrative Record ("Tr.") at 143-52.) Her applications were denied initially and on reconsideration. (Tr. at 81-84.) Plaintiff, subsequently, requested a hearing before an Administrative Law Judge ("ALJ"), (Tr. at 99), which was held on February 22, 2010, (Tr. at 50-80). On April 1, 2010, ALJ Lauren R. Mathon issued a decision finding that Plaintiff was not disabled. (Tr. at 26-35.) Thereafter, the Appeals Council denied Plaintiff's request for review, (Tr. at 6-8), rendering the ALJ's

decision the final decision of the Commissioner. Plaintiff then sought judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

The Court must affirm the ALJ's findings if the findings are supported by substantial evidence and are free from reversible legal error. See Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998); Marcia v. Sullivan, 900 F.2d 172, 174 (9th Cir. 1990). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); see Reddick, 157 F.3d at 720.

In determining whether substantial evidence supports a decision, the Court considers the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion. See Reddick, 157 F.3d at 720. "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); see Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989). "If the evidence can reasonably support either affirming or reversing the [Commissioner's] conclusion, the court may not substitute its judgment for that of the [Commissioner]." Reddick, 157 F.3d at 720-21.

## III. THE ALJ'S FINDINGS

In order to be eligible for disability or social security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An ALJ determines a claimant's eligibility for benefits by following a five-step sequential evaluation:

(1) determine whether the applicant is engaged in "substantial gainful activity";

(2) determine whether the applicant has a medically severe impairment or combination of impairments;

- 2 -

> (3) determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;
>
> (4) if the applicant's impairment does not equal one of the listed impairments, determine whether the applicant is capable of performing his or her past relevant work;
>
> (5) if the applicant is not capable of performing his or her past relevant work, determine whether the applicant is able to perform other work in the national economy in view of his age, education, and work experience.

See Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (citing 20 C.F.R. § 404.1520). At the fifth stage, the burden of proof shifts to the Commissioner to show that the claimant can perform other substantial gainful work. See Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of December 29, 2007. (Tr. at 28.) At steps two and three, the ALJ found that Plaintiff's peripheral neuropathy was a "severe" impairment, but that she did not have an impairment or combination of impairments that met or equaled one of the per se disabling impairments listed at 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. at 28-30.) After considering the entire record, including Plaintiff's subjective complaints and the objective medical evidence, the ALJ determined that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1527(b) with:

- standing/walking up to six hours in an eight-hour workday and sitting up to six hours in an eight-hour workday (with normal breaks);
- frequent use of ramps and stoop;
- occasional use of stairs, balancing, kneeling, crouching, and crawling;
- no climbing of ladders, ropes, or scaffolds; and
- no concentrated exposure to hazards (such as heights or machines requiring agility)

(Tr. at 30-34.)[1] At steps four and five, the ALJ relied on vocational expert testimony to find that Plaintiff could not perform her past relevant work as a licensed practical nurse (medium, skilled), but that she had skills from that work that would transfer to the job of phlebotomist

---

[1] "Residual functional capacity" is defined as the most a claimant can do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks.

- 3 -

1  (light, semi-skilled). (Tr. at 34.) Based on the vocational expert's testimony, the ALJ
2  concluded that Plaintiff could perform the job of phlebotomist, which existed in significant
3  numbers in the national economy. (Tr. at 34-35.) Thus, the ALJ determined that she was not
4  disabled. (Tr. at 35.)

## IV. DISCUSSION

In her brief, Plaintiff contends that the ALJ erred by: (1) failing to properly weigh the medical opinions of record; (2) failing to properly evaluate her credibility; and (3) relying upon flawed vocational expert testimony. Plaintiff requests that the Court remand for determination of disability benefits or, in the alternative, remand for further administrative proceedings.

**A.     Medical Opinions of Record**

Plaintiff first argues that the ALJ improperly rejected every treating and examining source of record, all of whom are relevant specialists, and instead relied upon the opinions of non-examining physicians who reviewed an incomplete record and gave opinions outside their respective specialties.

Agency regulations distinguish among the opinions of three types of accepted medical sources: (1) sources who have treated the claimant; (2) sources who have examined the claimant; and (3) sources who have neither examined nor treated the claimant, but express their opinion based upon a review of the claimant's medical records. See 20 C.F.R. § 404.1527. A treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a non-examining reviewing or consulting physician's opinion. See Benecke v. Barnhart, 379 F.3d 587, 592 (9th Cir. 2004); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). The Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of a treating or examining physician. See Lester, 81 F.3d at 830. If the opinion is contradicted, it can be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. See Andrews, 53 F.3d at 1043. Since the opinions of treating physician, Dr. Charles Tadlock, and examining physicians, Drs. Steven Holper and Neil Soni, were contradicted by

1  the opinions of the reviewing state agency physicians, the specific and legitimate standard
2  applies.

3　　　　　Historically, the courts have recognized the following as specific, legitimate reasons
4  for disregarding a treating or examining physician's opinion: conflicting medical evidence;
5  the absence of regular medical treatment during the alleged period of disability; the lack of
6  medical support for doctors' reports based substantially on a claimant's subjective complaints
7  of pain; medical opinions that are brief, conclusory, and inadequately supported by medical
8  evidence.  See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005); Flaten v. Secretary
9  of Health and Human Servs., 44 F.3d 1453, 1463-64 (9th Cir. 1995); Fair v. Bowen, 885 F.2d
10 597, 604 (9th Cir. 1989).  Here, the Court finds that the ALJ properly gave specific and
11 legitimate reasons, based on substantial evidence in the record, for discounting the opinions
12 of Drs. Tadlock, Holper and Soni.

13　　　　　Plaintiff was involved in a motor vehicle accident on May 10, 2004.  (Tr. at 220-33.)
14 Among other complaints, Plaintiff indicated that she had been barefoot when the accident
15 occurred and had tingling in her toes and diffuse foot and ankle pain.  (Tr. at 238.)
16 Subsequent x-rays of Plaintiff's left foot post-motor vehicle accident were normal.  (Tr. at
17 262.)

18　　　　　Kenneth Blocher, D.P.M., evaluated Plaintiff on August 3, 2004.  (Tr. at 258.)  At that
19 time, Plaintiff complained of bilateral foot pain that was somewhat worse on the right.  (Tr.
20 at 258.)  She also described tingling in her toes that sometimes changed to sharp discomfort.
21 (Tr. at 258.)  Upon examination, Dr. Blocher noted diffuse tenderness in the plantar aspects
22 of both feet, right greater than left, and pain with mild percussion of the tarsal tunnel areas,
23 right greater than left. (Tr. at 258.)  Dr. Blocher diagnosed tarsal tunnel syndrome and a right
24 ankle injury, which improved "to about 50% with physical therapy."  (Tr. at 258.)  On
25 August 11, 2004, Plaintiff reported no improvement with extreme pain in the evening.  (Tr.
26 at 258.)  Dr. Blocher provided orthotics.  (Tr. at 257-58.)

27　　　　　Nerve conduction studies of Plaintiff's lower extremities conducted on September 15,
28 2004, were normal, however, showing no evidence of right or left tarsal tunnel syndrome.

(Tr. at 238-39.) Plaintiff had full (5/5) lower extremity strength and intact reflexes. (Tr. at 238.) Later, on September 22, 2004, Plaintiff told Dr. Blocher that she had been unable to tolerate the orthotics. (Tr. at 257.) So, on September 29, 2004, Dr. Blocher adjusted them and administered a trigger point injection. (Tr. at 256.)

On October 20, 2004, Plaintiff reported that the injection had helped and that the pain from her orthotics had improved. (Tr. at 256.) The following month, though, she stated that the orthotics were not helping, and that she continued to have tenderness and tingling sensations and requested surgical intervention. (Tr. at 255.)

On December 3, 2004, Plaintiff underwent bilateral tarsal tunnel release surgery, performed by Dr. Blocher. (Tr. at 253-254.) She improved (Tr. at 252) and, as of January 3, 2005, was doing well except for occasional discomfort of the bottoms of her feet, (Tr. at 251). By late January of 2005, she had some localized redness and swelling and some numbness and tingling, which was "improving daily." (Tr. at 250.) Overall, she had "significantly improved," was able to wear regular shoes, and was returning back to work. (Tr. at 250.)

On July 12, 2005, nerve conduction studies of Plaintiff's lower extremities were again normal. (Tr. at 234-35.) A bone scan later showed mild increased tracer uptake along the right superior talus region and dorsal aspect of left mid-foot. (Tr. at 310.) On August 10, 2005, an MRI of left foot showed mild insertional tendinitis with minimal interstitial partial tearing of the posterior tibial tendon and mild degenerative changes of the first MTP joint. (Tr. at 308.) An MRI of the right foot suggested plantar fasciitis and showed degenerative changes of the mid-foot and talonavicular joint. (Tr. at 309.)

On August 19, 2005, Stanley Graves, M.D., an orthopedist, reviewed the MRI and explained, "I do not think that this coalition has anything to do with her injury or her present complaints. The degenerative changes are secondary to the compensation for the coalition in the talonavicular joint and the abnormal shape is also secondary to this congenital condition and not related to the accident." (Tr. at 279-81.) Dr. Graves stated that Plaintiff would have permanent impairment to both lower extremities no matter what treatment was

pursued, and assessed a 10% impairment of bilateral lower extremities. (Tr. at 279-81.) He noted that Plaintiff had been able to return to rather significant function. (Tr. at 279-81.) He said she stood frequently at her job, but not as much as she had previously, and that she could stand for up to six hours (with intermittent breaks) without significant restriction. (Tr. at 279-81.) On January 5, 2006, Dr. Graves noted that Plaintiff had continued ankle symptoms, and that surgery was warranted. (Tr. at 278.) Following the surgery on February 14, 2006, (Tr. at 241-44, 276-77), Plaintiff continued to have some discomfort, but was better than before surgery, (Tr. at 273-75).

She returned to Dr. Graves on May 12, 2006, stating that her pain had worsened. (Tr. at 272.) On examination, she had tenderness and minimal swelling. (Tr. at 272.) Dr. Graves explained that it would "take many months to know how well she will do," and that she could maintain her light duty work status where she usually sat on the job. (Tr. at 272.) He said her treatment should include three to four office visits a year over the next 10 years and occasional pain management. (Tr. at 272.) The following month, Plaintiff still had foot and ankle discomfort, but had made some progress, her medications helped, and she continued to work. (Tr. at 271.) Dr. Graves later opined that Plaintiff's symptoms had reached a "stationary status" and that Plaintiff could walk for 15 minutes at a time. (Tr. at 270.) He concluded, "[a]t this stage I do not see that she will require future surgery." (Tr. at 270.)

On November 10, 2006, Plaintiff returned to Dr. Graves for her foot complaints, but stated that her medication helped. (Tr. at 269.) Upon examination, she had mild swelling and intermittent radiating pain, but good range of motion. (Tr. at 269.) Dr. Graves felt Plaintiff would probably "always have discomfort," but did not think working would cause any harm. (Tr. at 269.) Several months later, in June of 2007, Dr. Graves ordered MRIs of Plaintiff's feet. (Tr. at 268.) The right foot MRI showed ankle joint effusion with no tears, fluid around flexor hallucis tendon consistent with a focal area of tenosynovitis, some edema within the anterior talus, and no fractures. (Tr. at 282.) The left foot MRI showed edema at the ankle joint with effusion, but intact tendons and no fractures. (Tr. at 283.) Dr. Graves

1 later noted that the MRIs did not show significant arthrosis and stated, "[a]fter reviewing her MRI, I don't see anything that should require surgery at this point." (Tr. at 267.) He recommended orthotic management further stabilize Plaintiff and administered injections. (Tr. at 267.)

On January 24, 2008, Plaintiff saw pain management specialist Charles Tadlock, M.D. (Tr. at 315-17.) Upon examination, Plaintiff had intact motor and sensory function and no edema. (Tr. at 315-17.) Dr. Tadlock diagnosed status post-multiple foot surgeries with ankle and foot pain. (Tr. at 315-17.) He prescribed a new medication. (Tr. at 315-17.)

On March 29, 2008, Plaintiff saw Neil Soni, M.D., with complaints of foot pain. (Tr. at 318-22.) She told Dr. Soni that she was unable to cook, clean, vacuum, mop, sweep, or do yard work, but that she could use the dishwasher, care for her personal needs, and drive using cruise control (even for short distances). (Tr. at 318-22.) She stated that she spent her days sitting in a chair with her feet elevated watching television, reading, or using a computer, and that she liked to sew. (Tr. at 318-22.) She also indicated that standing or dangling her feet made her pain worse. (Tr. at 318-22.)

On examination, Plaintiff walked independently with a limp, was able to get on and off of exam table, was able get in and out of a chair, and take her socks off and on without difficulty. (Tr. at 318-22.) She had some swelling of her ankles and was unable to tandem walk, but could stand on her toes and heels with pain. (Tr. at 318-22.) She had pain with resistance to the ankles, but not with active range of motion. (Tr. at 318-22.) She had full motor strength, normal reflexes, and hypersensitivity to touch and pinprick in feet and ankles. (Tr. at 318-22.) Dr. Soni diagnosed peripheral neuropathy of feet with allodynia. (Tr. at 318-22.) He opined that Plaintiff could be expected to: stand less than two hours in an eight-hour workday; sit unlimited in an eight-hour workday as long as the feet were elevated; and lift 10 pounds frequently and 20 pounds occasionally. (Tr. at 318-22.)

On June 12, 2008, Jean Goerss, M.D., state agency physician, reviewed all of the evidence and found that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds

- 8 -

1 frequently; sit and stand/walk about six hours each in an eight-hour workday; frequently
2 stoop; occasionally climb ramps/stairs, balance, kneel, crouch, and crawl; and never climb
3 ladders/ropes/scaffolds. (Tr. at 323-30.) Dr. Goerss also found that Plaintiff should avoid
4 concentrated exposure to hazards. (Tr. at 323-30.) Ultimately, Dr. Goerss concluded that
5 Plaintiff is capable of light exertional work and that "[t]he diagnosis of tarsal tunnel
6 syndrome is entirely based on [symptoms] in this case." (Tr. at 323-30.) Specifically, Dr.
7 Goerss stated that "[t]he only objective sign is an MRI of the R foot (6/8/07) showing a small
8 effusion at the flexor hallicus longus near the talus which is the location of the nerve that is
9 entrapped or damaged in tarsal tunnel syndrome. The MRI of the L foot was normal. EMG
10 is normal." (Tr. at 323-30.)

11 Later, on June 26, 2008, Plaintiff saw Dr. Tadlock with questions about her
12 medications. (Tr. at 338.) On examination, she had pain in her right foot but was alert,
13 oriented, and in no acute distress and had no edema. (Tr. at 338.) Dr. Tadlock continued
14 Plaintiff's medications. (Tr. at 338.) One month later, Plaintiff was doing well with no
15 significant complaints. (Tr. at 337.) Examination and treatment recommendations were
16 unchanged. (Tr. at 337.)

17 On January 22, 2009, Thomas Glodek, M.D., a state agency physician, reviewed the
18 evidence and concurred with Dr. Goerss' prior assessment. (Tr. at 358; 323-30.)

19 On January 29, 2009, Plaintiff saw Dr. Tadlock for the first time since July of 2008.
20 (Tr. at 386.) Dr. Tadlock indicated that Plaintiff was "fully disabled" by her severe bilateral
21 tarsal tunnel and unrelenting pain, which made her unable to stand more than a few minutes
22 at a time. (Tr. at 386.) Examination and treatment recommendations were unchanged. (Tr.
23 at 386.) That same day, Dr. Tadlock completed a Lower Extremities Impairment
24 Questionnaire stating that Plaintiff had a less than sedentary residual functional capacity,
25 would require frequent unscheduled breaks, and would miss more than thee days of work per
26 month. (Tr. at 367-74.)

27 Ten months later, on November 20, 2009, Dr. Tadlock noted that Plaintiff was
28 satisfied with her activity level, which had improved with treatment. (Tr. at 379-80.)

1  Plaintiff stated that her pain level was also acceptable, and that she was satisfied with her
2  medications. (Tr. at 379-80.) Upon examination, Plaintiff was alert, oriented, and in no
3  acute distress with intact motor function and sensation. (Tr. at 379-80.)

4  On February 5, 2010, Plaintiff saw Steven Holper, M.D., for a medical evaluation at
5  the request of her attorney. (Tr. at 388-92.) She complained of bilateral foot pain and right
6  hip pain. (Tr. at 388-92.) She stated that she "gets around the home environment" with an
7  electric wheelchair or cane, needed to elevate her feet, and that her husband did most of the
8  housework. (Tr. at 388-92.) She indicated that she was able to care for her personal needs
9  and drive. (Tr. at 388-92.) Dr. Holper diagnosed chronic/permanent neuropathic pain
10 syndrome of both lower extremities status post-bilateral tarsal tunnel surgeries. (Tr. at 388-
11 92.) He concluded that Plaintiff's symptoms would "preclude and/or interfere with cognitive
12 endeavors in the work environment," that she could not work an eight-hour day due to her
13 inability to stand or walk for at least six hours per day, and that she was likely "disabled
14 under the Social Security Act." (Tr. at 388-92.) He also completed a Lower Extremities
15 Impairment Questionnaire, finding that Plaintiff had a less than sedentary residual functional
16 capacity, required unscheduled breaks, and would miss more than three days of work per
17 month. (Tr. at 394-401.)

18 On May 14, 2010, Dr. Tadlock sent Plaintiff for a podiatry consult and noted that she
19 was having hip pain and using a cane. (Tr. at 403-04.) His foot examination was unchanged.
20 (Tr. at 403-04.) He diagnosed degenerative disease of the right hip and foot pain, for which
21 he prescribed medications. (Tr. at 403-04.)

22 After considering the medical evidence, the ALJ first addressed Dr. Tadlock's
23 conclusion, which, as previously indicated, found Plaintiff "fully disabled due to bilateral
24 tarsal tunnel syndrome and severe, unrelenting pain in her feet, making her unable to stand
25 for more than a few minutes." (Tr. at 32-33.) The ALJ stated:

26 > The undersigned declines to give controlling weight to Dr. Tadlock's
27 > assessment. There is limited support in the contemporaneous treatment records
28 > for such a restrictive assessment. Dr. Tadlock's treating notes basically
   > summarize the claimant's subjective complaints, diagnoses and medication,
   > but do no present objective clinical or diagnostic findings to support his

- 10 -

> opinion. It is noted that there is no indication of the need for the claimant to keep her feet elevated.

(Tr. at 32-33.) Indeed, Dr. Tadlock's reports showed that during 2008, Plaintiff, despite allegations of debilitating pain, was alert, oriented, and in no apparent distress, (Tr. at 338), and that she had intact motor and sensory function, (Tr. at 317). Although Plaintiff reported doing well with no significant complaints in July of 2008, (Tr. at 337), Dr. Tadlock issued an opinion of disabling limitations in January of 2009, (Tr. at 367-74, 386). At her next visit ten months later, Plaintiff stated that she was satisfied with her activity and pain level, which had improved with treatment. (Tr. at 379.) She was again noted to be in no apparent distress with intact motor function. (Tr. at 379-80, 407-08.)

Next, in assessing Dr. Holper's opinion, the ALJ found that – although Dr. Holper concluded that "the claimant would be unable to work an entire eight-hour workday," "could not be expected to sit for six hours per day nor stand or talk the remaining two hours," "is unable to stand/walk a minimum of six hours per day [–] precluding full time employment," "had symptoms that would preclude and/or interfere with cognitive endeavors in the work place" – "this assessment has been evaluated and considered but is given limited weight as it is based on a single evaluation and is apparently based to a great degree on the claimant's subjective complaints and indication that she needs to maintain her feet in an elevated position." (Tr. at 33.)

In her discussion of Dr. Soni's March 29, 2008 medical source statement, the ALJ stated that Dr. Soni "gave no postural limitation on bending, stooping, crouching or crawling and no manipulative, environmental or other limitations." (Tr. at 33.) Dr. Soni further reported that, despite Plaintiff's recognized foot pain, she retained the ability to walk independently, get on and off of the examination table, get in and out of a chair, take her socks on and off without difficulty, and stand on her toes and heels. (Tr. at 320-22.) She also retained full motor strength and normal reflexes. (Tr. at 321-22.) The ALJ afforded Dr. Soni's assessment "limited weight as being based in part on the claimant's subjective

complaints as opposed to objective medical evidence and is too restrictive in light of the claimant's daily activities." (Tr. at 33.)

Lastly, the ALJ referenced the opinion of state agency physician, Dr. Goerss, who reviewed the record on June 12, 2008, and found that Plaintiff was capable of light exertional work. (Tr. at 33.) Significantly, the ALJ noted that Dr. Goerss determined that the diagnosis of tarsal tunnel syndrome was based entirely on symptoms as "[a]n MRI of the foot was normal and electromyography was normal." (Tr. at 33.) The ALJ gave Dr. Goerss' opinion significant weight as being consistent with the overall evidence available at the hearing level. (Tr. at 33.)

The ALJ is tasked with determining credibility and resolving conflicts in medical testimony, not this Court. See Andrews, 53 F.3d at 1039. "The ALJ need not accept an opinion of a physician ... if it is conclusionary and brief and is unsupported by clinical findings." Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992). When "the evidence is susceptible to more than one rational interpretation," this Court "must uphold the ALJ's decision." Andrews, 53 F.3d at 1039-40.

In light of the medical evidence, the Court finds that ALJ provided specific and legitimate reasons, based on substantial evidence in the record, for discounting the opinions of Drs. Tadlock, Holper and Soni as being based on Plaintiff's subjective complaints. See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (since the record supported the ALJ's credibility finding, he was free to disregard opinion that was premised on subjective complaints) (citing Fair, 885 F.2d at 605). Further, as the record demonstrates, the doctors' opinions were specifically contradicted by the opinions of the reviewing state agency physicians and the clinical findings of record.

**B.     Credibility of Plaintiff's Subjective Complaints**

Plaintiff argues that the ALJ erred in failing to properly evaluate her credibility. In Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986), the Ninth Circuit established two requirements for a claimant to present credible symptom testimony: The claimant must produce objective medical evidence of an impairment or impairments, and he must show the

1  impairment or combination of impairments could reasonably be expected to produce some
2  degree of symptom. <u>See</u> <u>id.</u> at 1407. The claimant, however, need not produce objective
3  medical evidence of the actual symptoms or their severity. <u>See</u> <u>Smolen v. Chater</u>, 80 F.3d
4  1273, 1284 (9th Cir. 1996).

5        If the claimant satisfies the above test and there is not any affirmative evidence of
6  malingering, the ALJ can reject the claimant's pain testimony only if he provides clear and
7  convincing reasons for doing so. <u>See</u> <u>Parra v. Astrue</u>, 481 F.3d 742, 750 (9th Cir. 2007)
8  (citing <u>Lester</u>, 81 F.3d at 834). General assertions that the claimant's testimony is not
9  credible are insufficient. <u>See</u> <u>id.</u> The ALJ must identify "what testimony is not credible and
10 what evidence undermines the claimant's complaints." <u>Id.</u> (quoting <u>Lester</u>, 81 F.3d at 834).

11       In weighing a claimant's credibility, the ALJ may consider many factors, including,
12 "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying,
13 prior inconsistent statements concerning the symptoms, and other testimony by the claimant
14 that appears less than candid; (2) unexplained or inadequately explained failure to seek
15 treatment or to follow a prescribed course of treatment; and (3) the claimant's daily
16 activities." <u>Smolen</u>, 80 F.3d at 1284; <u>see</u> <u>Orn v. Astrue</u>, 495 F.3d 625, 637-39 (9th Cir. 2007).
17 The ALJ also considers "the claimant's work record and observations of treating and
18 examining physicians and other third parties regarding, among other matters, the nature,
19 onset, duration, and frequency of the claimant's symptom; precipitating and aggravating
20 factors; functional restrictions caused by the symptoms; and the claimant's daily activities."
21 <u>Smolen</u>, 80 F.3d at 1284 (citation omitted).

22       At the administrative hearing, Plaintiff testified that she stopped working on
23 December 29, 2007, because of foot pain that she had as a result of her automobile accident
24 in 2004. (Tr. at 55-56.) She indicated that she had numbness, tingling, and shooting pain in
25 her feet and ankles, and also had pain in her right hip since August of 2009. (Tr. at 56, 61.)
26 She stated that prolonged standing made her symptoms worse, (Tr. at 57, 59, 60), and that
27 sitting caused hip pain, (Tr. at 61-62). She said that after August of 2009 she could sit for
28 an hour or two. (Tr. at 62.) Plaintiff testified that she could lift five to 15 pounds without

1   problems, (Tr. at 62); she said she had a walker, but had not used it since December of 2007,
2   (Tr. at 62); and she used a cane that was not prescribed since approximately August of 2009,
3   (Tr. at 62-63).

4   Plaintiff stated that her medications "curb[ed] the symptoms but did not get rid of it
5   completely," and made her sleepy, (Tr. at 57), and that she elevated her feet, took showers,
6   and soaked her feet to help her symptoms, (Tr. at 58-59). She said that she had no difficulties
7   dressing or bathing herself and could drive short distances. (Tr. at 63-65.) She indicated that
8   she tried to cook and dust, but that housework was usually too painful for her to do for more
9   than a few minutes. (Tr. at 63-64.) She said that she went to church several times a week,
10  lead a woman's Bible study, and played the piano without the foot pedals. (Tr. at 65-66.)
11  Generally, Plaintiff stated that she spent her time reading, watching television, or using a
12  computer for five or ten minutes at a time. (Tr. at 65.) She shopped while riding a cart, (Tr.
13  at 67), and also stated that she went to Las Vegas approximately once per year, (Tr. at 69).
14  During the hearing, Plaintiff stated that she went to South Carolina for a week in 2007 and
15  2008. (Tr. at 70.)

16  Having reviewed the record along with the ALJ's credibility analysis, the Court finds
17  that the ALJ made extensive credibility findings and identified several clear and convincing
18  reasons supported by the record for discounting Plaintiff's statements regarding her
19  limitations. Although the ALJ recognized that Plaintiff had medical impairments that could
20  produce some pain and other symptoms, she also found that her allegations concerning the
21  extent of her resulting limitations were not fully credible. (Tr. at 32.)

22  In her evaluation of Plaintiff's testimony, the ALJ first referenced Plaintiff's daily
23  activities – which included the abilities to drive short distances, attend church several times
24  a week, lead Bible study classes, play the piano (without using the foot pedals), attend choir
25  practice, run errands, shop, go out to eat, and care for her personal needs – finding that said
26  activities detracted from her claims of disability. (Tr. at 32, 64-67, 70.) The ALJ also
27  referenced an investigation, which revealed that Plaintiff was observed walking to and from
28  her vehicle and carrying things without apparent difficulty. (Tr. at 32, 199-202.) While not

alone conclusive on the issue of disability, an ALJ can reasonably consider a claimant's daily activities in evaluating the credibility of her subjective complaints. See, e.g., Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1175 (9th Cir. 2008) (upholding ALJ's credibility determination based in part of the claimant's abilities to cook, clean, do laundry, and help her husband with the finances); Burch v. Barnhart, 400 F.3d 676, 680-81 (9th Cir. 2005) (upholding ALJ's credibility determination based in part on the claimant's abilities to cook, clean, shop, and handle finances).

In addition to evidence of Plaintiff's daily activities, the ALJ explained that there were other inconsistencies that detracted from Plaintiff's credibility. For instance, the ALJ noted that Plaintiff went long periods of time (during the time period at issue) without seeking any medical treatment. (Tr. at 32.) In so noting, the ALJ acknowledged Plaintiff's claim the she, at times, did not have insurance. (Tr. at 32.) There is, however, no evidence that Plaintiff sought low or no cost treatment, or that she was denied care for financial reasons. See Moncada v. Chater, 60 F.3d 521, 524 (9th Cir. 1995) (claimant's allegations of disabling pain could be discredited by evidence of infrequent medical treatment); Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992) (ALJ properly considered claimant's failure to seek treatment, despite allegations of an inability to afford such treatment, where the claimant had not sought low cost treatment and had not been denied care for financial reasons). And, when she did in fact receive treatment, the ALJ determined that "the claimant received only minimal, conservative treatment for her complaints, consisting primarily of pharmacological remedies, after her tarsal tunnel surgeries." (Tr. at 32); see Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (evidence of "conservative treatment" is sufficient to discount a claimant's testimony regarding severity of an impairment).

Lastly, the ALJ found that the objective medical evidence (previously discussed) did not support limitations of the degree alleged. (Tr. at 32.); see Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.") (citation omitted); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) (lack of

1  objective medical evidence supporting claimant's allegations supported ALJ's finding that
2  claimant was not credible).

3  In summary, the ALJ provided a sufficient basis to find Plaintiff's allegations not
4  entirely credible. While perhaps the individual factors, viewed in isolation, are not sufficient
5  to uphold the ALJ's decision to discredit Plaintiff's allegations, each factor is relevant to the
6  ALJ's overall analysis, and it was the cumulative effect of all the factors that led to the ALJ's
7  decision. The Court concludes that the ALJ has supported her decision to discredit Plaintiff's
8  allegations with specific, clear and convincing reasons and, therefore, the Court finds no
9  error.

10 **C.     Vocational Expert Testimony**

11 Plaintiff contends that the ALJ relied upon flawed vocational expert testimony.
12 Plaintiff states that the "RFC presented in the hypothetical to the VE here was based entirely
13 upon the opinion of the non-examining physician." Plaintiff argues that the opinion of the
14 non-examining physician is not substantial evidence.

15 The vocational expert testified that Plaintiff's past work was as a licensed practical
16 nurse (medium, skilled), and that she had skills from that job that would transfer to the
17 occupation of phlebotomist (light, semi-skilled). (Tr. at 73-74.)  The vocational expert
18 testified that someone with the limitations the state agency physicians assessed, (Tr. at 323-
19 30, 358), could perform the job of phlebotomist, (Tr. at 76), but that someone with the
20 limitations assessed by Dr. Tadlock, (Tr. at 366-74), or Dr. Holper (Tr. at 388-92), could not,
21 (Tr. at 77-78).

22 Plaintiff argument appears to misconstrue the record. The ALJ relied on vocational
23 expert testimony to conclude that someone with the residual functional capacity that she
24 ultimately found (after consideration of all the evidence on record) could perform the job of
25 phlebotomist, which existed in significant numbers in the national economy. (Tr. at 34-35,
26 76). Plaintiff does not challenge that someone with the residual functional capacity found
27 by the ALJ could perform a significant number of jobs in the national economy. Thus, the
28 Court finds no error.

## V. CONCLUSION

Substantial evidence supports the ALJ's decision to deny Plaintiff's claim for disability insurance benefits and supplemental security income benefits in this case. The ALJ gave specific and legitimate reasons, based on substantial evidence in the record, for discounting the opinions of Drs. Tadlock, Holper and Soni, and properly discredited Plaintiff's credibility providing clear and convincing reasons supported by the record for discounting Plaintiff's statements regarding her limitations. Consequently, the ALJ's decision is affirmed. Based upon the foregoing discussion,

**IT IS ORDERED** that the decision of the ALJ and the Commissioner of Social Security be affirmed;

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly. The judgment will serve as the mandate of this Court.

DATED this 22nd day of March, 2012.

*Michelle H. Burns*
Michelle H. Burns
United States Magistrate Judge